**SHUB & JOHNS LLC**
Samantha E. Holbrook
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
(610) 477-8380
sholbrook@shublawyers.com

**MILBERG COLEMAN BRYSON
PHILLPS GROSSMAN, PLLC**
John J. Nelson
280 S. Beverly Drive
Beverly Hills, CA 92102
Telephone: (858) 209-6941
jnelson@milberg.com

**CLAYEO C. ARNOLD, APC**
Gregory Haroutunian (SBN 330263)
12100 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025
Telephone: (747) 777-7748
gharoutunian@justice4you.com

*Interim Co-Lead Counsel for Plaintiffs
and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| IN RE F21 OPCO, LLC DATA BREACH LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 2:23-cv-07390-MEMF-AGR<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tristen Barrett-Jones, Erin Scott, Cassidy Massengill, Akhiria Muldrow, and Victoria Rosas ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint and allege the following against F21 OpCo LLC (d/b/a Forever 21) ("Forever 21" or "Defendant"), based upon personal knowledge with respect to themselves and upon information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1.    This class action arises out of the March 2023 data breach (the "Data Breach") involving Forever 21, which compromised the personally identifiable information ("PII") and/or personal health information ("PHI") (collectively, "Private Information") of at least 539,207 current and former employees, including Plaintiffs and Class Members.

2.    According to Forever 21, who collected and stored Plaintiffs' PII for business purposes, the PII compromised in the Data Breach included highly-sensitive information including but not limited to personal information, such as names, Social Security numbers, dates of birth, bank account numbers (without access code or pin), and information regarding Forever 21 health plans, including enrollment and premiums paid, of over 539,027 Class Members.[1]

3.    As a result of the Data Breach, Plaintiffs and Class Members have experienced and/or are at a substantial and imminent risk of experiencing identity theft and various other forms of personal, social, and financial harm. This risk will remain for their respective lifetimes.

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/dfe496ce-bd38-477c-912a-26bd54798369.shtml (last accessed July 10, 2024).

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

4.     The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves, including but not limited to, Social Security numbers that Forever 21 collected from its current and former employees and maintained in its systems, sometimes for more than a decade after the employees stopped working there. Compounding the damage done by the Data Breach, Forever 21 failed to notify affected Class Members until over five months after it discovered the Data Breach.

5.     Social Security numbers are particularly valuable to criminals. This information can be sold and traded on the dark web black market. The loss of a Social Security number is particularly troubling because it cannot be easily changed and can be misused in a range of nefarious activities, such as filing fraudulent tax returns to steal tax refund payments, opening new accounts to take out loans, and other forms of identity theft.

6.     The Data Breach was a direct result of Forever 21's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff and Class Members' Private Information. Inexplicitly, Defendant acknowledged that the cybersecurity attack occurred on March 20, 2023, but waited until August 2023 before contacting Class Members.

7.     On or about August 29, 2023, Defendant notified state Attorneys General and many Class Members about the widespread Data Breach (the "Notice Letter"). [2]

8.     Forever 21 began sending Notice Letters to Class Members soon after. The Notice Letter provides no further information regarding the Data Breach

_____

[2] Sample Notice Letter available at the Office of the California Attorney General, https://oag.ca.gov/system/files/1Y%20F21%20Master%20Individual%20Notification%20Letter.pdf (last visited July 10, 2024).

-2-
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

and only recommends how victims can place a fraud alert or credit freeze on their account and how to sign up for the limited identity monitoring services Defendant offered in response to the Data Breach. The Notice Letter does not explain how the Data Breach occurred, what steps Defendant took following the Data Breach, whether Defendant made any changes to its data security, or most importantly, whether Plaintiffs' and Class Members' PII remains in the possession of criminals.

9.     This was not a passive data breach where, for example, it is unclear whether the compromised data was targeted or even seen. By Forever 21's own acknowledgement, the Data Breach here occurred because "an unauthorized third party" accessed its computer network and "obtained select files" with the sensitive personal information of Plaintiff and Class Members.

10.     There has been no assurance offered by Forever 21 that all personal data or copies of data have been recovered or destroyed, or that it has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

11.     Therefore, Plaintiffs and Class Members are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of identity theft and other fraudulent misuse of their Private Information, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

12.     Plaintiffs bring this lawsuit on behalf of themselves and all of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that

their

information was unsecured and left open to the unauthorized access by any unknown third party.

13. The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Forever 21, especially considering that Forever 21 previously experienced data breaches in 2018[3] and 2017[4] and thus Forever 21 was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

14. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15. The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Forever 21, and thus Forever 21 was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members exceeds 100, many of whom have different citizenship, including certain Plaintiffs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

---

[3] https://oag.ca.gov/ecrime/databreach/reports/sb24-137352 (last accessed July 10, 2024)
[4] https://oag.ca.gov/ecrime/databreach/reports/sb24-131937 (last accessed July 10, 2024)

---

-4-
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

17.    This Court has personal jurisdiction over Forever 21 because its principal place of business is in this District and it conducts substantial business in this District.

18.    Venue is proper in this District because Forever 21's principal place of business is in this District and a significant amount of the events leading to Plaintiffs' causes of action occurred in this District.

## PARTIES

### Plaintiffs

19.    Plaintiff Tristen Barrett-Jones is a resident and citizen of Missouri, where she intends to remain.

20.    Plaintiff Erin Scott is a resident and citizen of California, where she intends to remain.

21.    Plaintiff Cassidy Massengill is a resident and citizen of California, where she intends to remain.

22.    Plaintiff Akhiria Muldrow is a resident and citizen of New Jersey, where she intends to remain.

23.    Plaintiff Victoria Rosas is a resident and citizen of Pennsylvania, where she intends to remain.

### Defendant

24.    Defendant F21 OpCo LLC d/b/a Forever 21 is a fashion retailer that sells accessories, beauty products, home goods, and clothing for women, men and children. Its principal place of business and headquarters is located at 110 East 9th Street, Suite A500, Los Angeles, California 90079.

## FACTUAL ALLEGATIONS

25.    Plaintiffs and the proposed Class are employees, including former employees, of Defendant. Forever 21 is an organization in the fashion industry

which describes itself as "a fashion industry leader making the latest trends accessible to all while inspiring unique style and confidence."[5] Founded in 1984, Forever 21 is a fashion retailer with 43,000 employees and 540 store locations worldwide.

26.    As noted above, Plaintiffs bring this class action against Forever 21 for Defendant's failure to properly secure and safeguard personally identifiable information, for failing to comply with industry standards to protect and safeguard that information, and for failing to provide timely, accurate, and adequate notice to Plaintiffs and other members of the Class that such information had been compromised.

### Forever 21's Unsecure Data Management

27.    As a condition of employment with Forever 21, Forever 21 requires that its employees entrust it with highly sensitive personal information. Plaintiffs and Class Members provided their PII to Forever 21 with the reasonable expectation and mutual understanding that Forever 21 would comply with its obligations to keep such information confidential and secure from unauthorized access.

28.    Because of the highly sensitive and personal nature of the information Forever 21 acquires and stores with respect to its employees, Forever 21, upon information and belief, promises to, among other things: keep employees' Private Information private; comply with industry standards related to data security and the maintenance of its employees' Private Information; inform its employees of its legal duties relating to data security and comply with all federal and state laws protecting employees' Private Information; only use and release

---

[5] https://www.forever21.com/us/aboutus/aboutus.html (last accessed on July 12, 2024)

employees' Private Information for reasons that relate to the services it provides; not store former employees' Private Information for longer than is necessary to carry out its business operations; and provide adequate notice to its current and former employees if their Private Information is disclosed without authorization.

29.    Data security is purportedly a critical component of Forever 21's business model. On its website, it maintains "…. our main goals are to gain and maintain your trust, including by addressing any questions or concerns you might have about the privacy and safety of your personal information when it is in our hands. In this regard, we have partnered with OneTrust, a leading technology platform, to allow us to better communicate with you and to respond to your requests more efficiently, maintain similar advanced standards for their hosting facilities to protect against unauthorized access."[6]

30.    By obtaining, collecting, using, and deriving a benefit from its employees' Private Information, Forever 21 assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

31.    Plaintiffs and Class Members relied on Forever 21 to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Forever 21 ultimately failed to do.

**Defendant's Inadequate Security Allowed the Data Breach to Occur**

32.    According to its August 29, 2023 letter concerning the breach, on or around March 20, 2023, Forever 21 noticed that "an unauthorized third party

---

[6] https://www.forever21.com/us/privacypolicy.html (last accessed on July 10, 2024)

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

accessed certain Forever 21 systems at various times between January 5, 2023 and March 21, 2023. Findings from the investigation indicate the unauthorized third party obtained select files from certain Forever 21 systems during this time period,"[7] impacting the personal information of Plaintiffs and Class Members. It is clear that these unauthorized third parties accessed Forever 21's systems in order to either use the Private Information themselves for nefarious purposes, or to sell it on the dark web.

33.    The database files that were compromised by the unnamed "unauthorized third party" included names, Social Security numbers, dates of birth, bank account information and other information related to Plaintiffs' and Class Members' employment.[8]

34.    Forever 21 had obligations created by contract, industry standards, and common law to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

35.    Plaintiffs and Class Members provided their Private Information to Forever 21 with the reasonable expectation and mutual understanding that Forever 21 would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

36.    Forever 21's data security obligations were particularly important given the substantial increase in cyberattacks carried out against employers in recent years.

37.    Forever 21 knew or should have known that its electronic records would be targeted by cybercriminals, particularly given that it had previously

---

[7] Data Breach Letter.

[8] Id.

experienced data breaches in 2017 and 2018, yet it failed to take the necessary precautions to protect Plaintiffs' and Class Members' Private Information from being compromised.

38.    In response to its admitted failure to safeguard Plaintiffs' and Class Members' Private Information, Forever 21's response is particularly paltry. In its Notice, Forever 21 offered Plaintiffs the opportunity to spend their time signing up for just 12 months of non-automatic credit monitoring.

39.    Forever 21 failed to secure the Private Information of the individuals that provided it with this sensitive information.  It failed to take appropriate steps to protect the Private Information of Plaintiffs and other Class Members from being disclosed.

### Forever 21 Failed to Comply with FTC Guidelines

40.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

41.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

42.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

43.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

44.     As evidenced by the Data Breach, Forever 21 failed to properly implement basic data security practices. Forever 21's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information evidences its negligent failure to comply with the standards set forth by Section 5 of the FTCA.

45.     Forever 21 was at all times fully aware of its obligation to protect the Private Information of its current and former employees yet failed to comply with such obligations. Forever 21 was also aware of the significant repercussions that would result from its failure to do so.

## **Forever 21 Failed to Comply with Industry Standards**

46.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect from current and former employees and maintain.

47.     Some industry best practices that should be implemented by businesses like Forever 21 include, but are not limited to, educating all employees, implementing strong password requirements, implementing multilayer security including firewalls, implementing anti-virus and anti-malware software, encrypting highly sensitive data, implementing multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Forever 21 failed to follow at least some, or perhaps all of, these industry best practices.

48.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Forever 21 failed to follow these cybersecurity best practices.

49.     Forever 21 also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and

RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

50.    Forever 21 failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### Forever 21 Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information

51.    In addition to its obligations under federal and state laws, Forever 21 owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Forever 21 owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of its current and former employees.

52.    To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance

(DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

53.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.   Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware

---

[9] *Id.* at 3-4.

attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find

information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product

notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic....[10]

54.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

### Secure internet-facing assets

- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials;

### Thoroughly investigate and remediate alerts

- Prioritize and treat commodity malware infections as potential full compromise;

### Include IT Pros in security discussions

---

[10] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/ protecting-against-ransomware (last visited July 10, 2024).

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall;
- Enable tamper protection;
- Enable cloud-delivered protection;
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[11]

55.    Moreover, given that Defendant was storing the PII of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[11] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020). https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited July 10, 2024).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

56.     Forever 21 breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Forever 21's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.   Failing to adequately protect current and former employees' Private Information;

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    e.   Failing to adhere to industry standards for cybersecurity as discussed above; and

    f.   Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

57.     Forever 21 negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information and exfiltrate such Private Information.

58.     Had Forever 21 remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

59.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft.

### Forever 21 Should Have Known that Cybercriminals Target PII to Carry Out Fraud and Identity Theft

60.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that current and former employees like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data. [12] Exposure of highly sensitive personal information that individuals to keep private may cause harm to them, such as the ability to obtain or keep employment. Individuals' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

61.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

---

[12] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/ documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/ informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on July 10, 2024).

62.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

63.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

64.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

65.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7

years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[13] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

66.    Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

67.    Indeed, a robust cyber black market exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the dark web.

68.    The value of such highly sensitive information is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that PII has considerable market value.

69.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII is stolen

---

[13] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited on July 10, 2024).

and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[14]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

70.    PII is a valuable commodity to identity thieves because once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

71.    As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future and have no choice but to vigilantly monitor their accounts and purchase credit monitoring and identity theft protection for many years to come.

### Plaintiffs and Class Members Have Suffered Common Injuries and Damages as a Result of Forever 21's Data Mismanagement

72.    As result of Defendant's ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

73.    Due to the Data Breach, and the foreseeable consequences of

---

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited July 10, 2024).

Plaintiffs' and Class Members' Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution or loss of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

### The Risk of Identity Theft to Plaintiff and Class Members Is Present and Ongoing

74.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

75.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

-23-
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

76.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

77.    The Dark Web is an unindexed layer of the internet that requires special software or authentication to access.[15] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. [16] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

78.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[17] The digital character of

---

[15] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 10, 2024).

[16] *Id.*

[17] *What is the Dark Web?* – Microsoft 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 10, 2024).

---

Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[18] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[19]

79.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[18] *Id.*; *see also* Louis DeNicola, *supra* note 25.

[19] *Id.*

illegally using your Social Security number and assuming your identity can cause a lot of problems.[20]

What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

80.    Even then, new a Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

81.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may

---

[20] Social Security Administration, *Identity Theft and Your Social Security Number* (2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 10, 2024).

[21] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 10, 2024).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[22]

82.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[23]

83.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[24] Defendant did not rapidly report to Plaintiffs and Class Members that their Private Information had been stolen.

84.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

85.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor

---

[22] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 10, 2024).

[23] *See 2019 Internet Crime Report*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 10, 2024).

[24] *Id.*

their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

86.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

87.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[25]

88.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching

---

[25] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), FTC (Dec. 7, 2009), http://www.ftc.gov/ speeches/harbour/091207privacyroundtable.pdf (last visited July 10, 2024).

third-party software.[26]

89.     According to the FTC, unauthorized Private Information disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[27]

90.     Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### Loss of Time to Mitigate the Risk of Identify Theft and Fraud

91.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

92.     Thus, due to Defendant's admitted recognition of the actual and

---

[26] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 10, 2024).

[27] *See, e.g.*, *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited July 10, 2024).

imminent risk of identity theft, Defendant offered Plaintiffs and Class Members abbreviated, non-automatic credit monitoring services.

93.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

94.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[28]

95.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

---

[28] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, PERSONAL INFORMATION: DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN (2007) ("GAO Report"), available at https://www.gao.gov/new.items/d07737.pdf (last visited July 10, 2024).

[29] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft. gov/Steps (last visited July 10, 2024).

96.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[30]



97.    Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and

---

[30] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://web.archive.org/web/20190304002224/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited July 10, 2024).

correcting their credit reports.[31]

### *Diminution of Value of the* Private Information

98.    Private Information is a valuable property right.[32] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

99.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

100.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[33]

101.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data, such as PHI,

---

[31] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited July 10, 2024).

[32] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited July 10, 2024).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

sells for $50 and up on the dark web.[34]

102.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36, 37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[38]

103.    As a result of the Data Breach, Plaintiffs' and Class Members' PII and PHI, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the dark web, where it may soon be available and holds significant value for the threat actors.

### *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

104.    To date, Defendant has done little to provide Plaintiffs and Class

---

[34] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited July 10, 2024).

[35] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LA Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers ((last visited July 10, 2024).

[36] https://datacoup.com/.

[37] https://digi.me/what-is-digime/.

[38] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 10, 2024).

Members with relief for the damages they have suffered as a result of the Data Breach.

105.   The abbreviated, non-automatic credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face ongoing identity theft and financial fraud for the remainder of their lives. Defendant also places the burden squarely on Plaintiffs and Class Members by requiring them to independently sign up for that service, as opposed to automatically enrolling all victims of this Data Breach.

106.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

107.   It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

108.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

109.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[39] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

110.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

111.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year, or more, per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### Injunctive Relief Is Necessary to Protect against Future Data Breaches

112.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

---

[39] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites /jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited July 12, 2024).

**Plaintiffs' Individual Experiences**

***Plaintiff Tristen Barrett-Jones***

113.   Plaintiff Barrett-Jones is a former employee of Forever21 and as a condition of her employment, she was required to supply Defendant with her Private Information. Plaintiff Barrett-Jones would not have accepted employment with Defendant had she known that Defendant would fail to take reasonable steps to ensure her Private Information remained confidential.

114.   Plaintiff Barrett-Jones is very careful about sharing her sensitive Private Information. Plaintiff Barrett-Jones stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

115.   At the time of the Data Breach—January 5, 2023 through March 21, 2023—Defendant retained Plaintiff Barrett-Jones's Private Information in its system.

116.   Plaintiff Barrett-Jones received the Notice Letter, by U.S. mail, directly from Defendant. According to the Notice Letter, Plaintiff Barrett-Jones's Private Information was improperly accessed and obtained by unauthorized third parties, including her Social Security number, date of birth, bank account number, and health plan information.

117.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Barrett-Jones to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]" [40] Plaintiff Barrett-Jones made reasonable efforts to mitigate the impact of the Data Breach, including but not

---

[40] Notice Letter.

limited to: researching and verifying the legitimacy of the Data Breach and monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Barrett-Jones has spent significant time on mitigation activities in response to the Data Breach—valuable time Plaintiff Barrett-Jones otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

118. Following the Data Breach, Plaintiff Barrett-Jones was forced to close her financial account following a series of suspicious activities indicating unauthorized attempts to access the account, which, upon information and belief, was caused by the Data Breach.

119. Plaintiff Barrett-Jones also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

120. The Data Breach has caused Plaintiff Barrett-Jones to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

121.   As a result of the Data Breach, Plaintiff Barrett-Jones anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

122.   As a result of the Data Breach, Plaintiff Barrett-Jones is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

123.   Plaintiff Barrett-Jones has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Erin Scott***

124.   Plaintiff Scott is a former employee of Forever21 and as a condition of her employment, she was required to supply Defendant with her Private Information. Plaintiff Scott would not have accepted employment with Defendant had she known that Defendant would fail to take reasonable steps to ensure her Private Information remained confidential.

125.   Plaintiff Scott is very careful about sharing her sensitive Private Information. Plaintiff Scott stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

126.   At the time of the Data Breach—January 5, 2023 through March 21, 2023—Defendant retained Plaintiff Scott's Private Information in its system.

127.   Plaintiff Scott received the Notice Letter, by U.S. mail, directly from Defendant. According to the Notice Letter, Plaintiff Scott's Private Information was improperly accessed and obtained by unauthorized third parties, including her Social Security number, date of birth, bank account number, and health plan

information.

128.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Scott to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]"[41] Plaintiff Scott made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, changing account passwords, and monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Scott has spent significant time on mitigation activities in response to the Data Breach—valuable time Plaintiff Scott otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

129.   Following her receipt of the Notice Letter, Plaintiff Scott purchased identity monitoring services from Experian to mitigate the consequences of the Data Breach.

130.   Plaintiff Scott suffered injury in the form of her Private Information being disseminated on the dark web, which, upon information and belief, was caused by the Data Breach.

131.   Plaintiff Scott suffered injury after an unauthorized individual used her Private Information to open a Square business account in September of 2023, which, upon information and belief, was caused by the Data Breach.

132.   Plaintiff Scott also suffered injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was

---

[41] Notice Letter.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

133.  The Data Breach has caused Plaintiff Scott to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

134.  As a result of the Data Breach, Plaintiff Scott anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

135.  As a result of the Data Breach, Plaintiff Scott is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

136.  Plaintiff Scott has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Cassidy  Massengill*

137.  Plaintiff  Massengill  is a former employee of Forever21 and as a condition of her employment, she was required to supply Defendant with her Private Information. Plaintiff Massengill  would not have accepted employment with Defendant had she known that Defendant would fail to take reasonable steps to ensure her Private Information remained confidential.

138.   Plaintiff Massengill  is very careful about sharing her sensitive Private Information. Plaintiff Massengill  stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

139.   At the time of the Data Breach—January 5, 2023 through March 21, 2023—Defendant retained Plaintiff Massengill 's Private Information in its system.

140.   Plaintiff Massengill  received the Notice Letter, by U.S. mail, directly from Defendant. According to the Notice Letter, Plaintiff Massengill's Private Information was improperly accessed and obtained by unauthorized third parties, including her Social Security number, date of birth, bank account number, and health plan information.

141.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Massengill  to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]"[42] Plaintiff Massengill  made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach and monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Massengill  has spent significant time on mitigation activities in response to the Data Breach—valuable time Plaintiff Massengill otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

142.   Plaintiff  Massengill   also suffered injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon

---

[42] Notice Letter.

information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

143.    The Data Breach has caused Plaintiff Massengill  to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

144.    As a result of the Data Breach, Plaintiff Massengill  anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

145.    As a result of the Data Breach, Plaintiff Massengill  is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

146.    Plaintiff Massengill has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Akhiria Muldrow

147.    Plaintiff Muldrow is a former employee of Forever21 and as a condition of her employment, she was required to supply Defendant with her Private Information. Plaintiff Muldrow would not have accepted employment with

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendant had she known that Defendant would fail to take reasonable steps to ensure her Private Information remained confidential.

148.    Plaintiff Muldrow is very careful about sharing her sensitive Private Information. Plaintiff Muldrow stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

149.    At the time of the Data Breach—January 5, 2023 through March 21, 2023—Defendant retained Plaintiff Muldrow's Private Information in its system.

150.    Plaintiff Muldrow received the Notice Letter, by U.S. mail, directly from Defendant. According to the Notice Letter, Plaintiff Muldrow's Private Information was improperly accessed and obtained by unauthorized third parties, including her Social Security number, date of birth, bank account number, and health plan information.

151.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Muldrow to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]"[43] Plaintiff Muldrow made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, changing her telephone number to stop spam and phishing calls, dealing with the suspicious activity and closure of her credit union account, and monitoring her other financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Muldrow has spent significant time on mitigation activities in response to the Data Breach—valuable time Plaintiff Muldrow

---

[43] Notice Letter.

otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

152.  Plaintiff Muldrow suffered injury after an unauthorized individual used her credit union account to funnel money through it and the account was subsequently shut down due to the suspicious activity in the summer of 2023, which, upon information and belief, was caused by the Data Breach.

153.  Plaintiff Muldrow suffered injury after she was forced to pay to deposit her paycheck with a check cashing service after she was locked out of her account and could not receive direct deposits.

154.  Plaintiff Muldrow also suffered injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

155.  The Data Breach has caused Plaintiff Muldrow to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

156.  As a result of the Data Breach, Plaintiff Muldrow anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

157.   As a result of the Data Breach, Plaintiff Muldrow is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

158.   Plaintiff Muldrow has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Victoria Rosas

159.   Plaintiff Rosas is a former employee of Forever21 and as a condition of her employment, she was required to supply Defendant with her Private Information. Plaintiff Rosas would not have accepted employment with Defendant had she known that Defendant would fail to take reasonable steps to ensure her Private Information remained confidential.

160.   Plaintiff Rosas is very careful about sharing her sensitive Private Information. Plaintiff Rosas stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

161.   At the time of the Data Breach—January 5, 2023 through March 21, 2023—Defendant retained Plaintiff Rosas's Private Information in its system.

162.   Plaintiff Rosas received the Notice Letter, by U.S. mail, directly from Defendant. According to the Notice Letter, Plaintiff Rosas's Private Information was improperly accessed and obtained by unauthorized third parties, including her Social Security number, date of birth, bank account number, and health plan information.

163.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Rosas to "be vigilant for incidents of

fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]"[44] Plaintiff Rosas made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, removing her publicly available information from the internet, (*e.g.*, the White Pages), and monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff Rosas has spent significant time, at least 21 hours so far, on mitigation activities in response to the Data Breach—valuable time Plaintiff Rosas otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

164.   Plaintiff Rosas suffered injury in the form of her Private Information being disseminated on the dark web, which, upon information and belief, was caused by the Data Breach.

165.   Plaintiff Rosas also suffered injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

---

[44] Notice Letter.

166. The Data Breach has caused Plaintiff Rosas to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

167. As a result of the Data Breach, Plaintiff Rosas anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

168. As a result of the Data Breach, Plaintiff Rosas is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

169. Plaintiff Rosas has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

170. This action is brought, and may properly proceed, as a class action, pursuant to the Federal Rules of Civil Procedure.

171. Plaintiffs seek certification of a class defined as follows:

All persons whose Private Information was compromised in the Data Breach as detected by Forever 21 on or around March 20, 2023, including all who received Notice of the Data Breach (the "Nationwide Class").

172. Plaintiffs Massengill and Scott seek certification of a subclass of California residents defined as follows:

All persons residing in the State of California whose Private Information was compromised in the Data Breach as detected by Forever 21 on or around March 20, 2023, including all who received Notice of the Data

Breach (the "California Subclass") (together with the Nationwide Class, the "Class").

173.    Plaintiff Barrett-Jones seeks certification of a subclass of Missouri residents defined as follows:

> All persons residing in the State of Missouri whose Private Information was compromised in the Data Breach as detected by Forever 21 on or around March 20, 2023, including all who received Notice of the Data Breach (the "Missouri Subclass") (together with the Nationwide Class, the "Class").

174.    Plaintiff Muldrow seeks certification of a subclass of New Jersey residents defined as follows:

> All persons residing in the State of New Jersey whose Private Information was compromised in the Data Breach as detected by Forever 21 on or around March 20, 2023, including all who received Notice of the Data Breach (the "New Jersey Subclass") (together with the Nationwide Class, the "Class").

175.    Plaintiff Rosas seeks certification of a subclass of Pennsylvania residents defined as follows:

> All persons residing in the State of Pennsylvania whose Private Information was compromised in the Data Breach as detected by Forever 21 on or around March 20, 2023, including all who received Notice of the Data Breach (the "Pennsylvania Subclass") (together with the Nationwide Class, the "Class").

176.    Excluded from the Class and subclass are Forever 21's officers and directors, and any entity in which Forever 21 has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Forever

21. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

177. **Numerosity**:  The members of the Class are so numerous that joinder of all of them is impracticable. As noted above, there are approximately 539,207 consumers affected.

178. **Existence/Predominance of Common Questions of Fact and Law**: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Forever 21 unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Forever 21 failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Forever 21's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Forever 21's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Forever 21 owed a duty to Class Members to safeguard their Private Information;

f. Whether Forever 21 breached its duty to Class Members to safeguard their Private Information;

g. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.  Whether Forever 21 knew or should have known that its data security systems and monitoring processes were deficient;

i.  Whether Forever 21's conduct was negligent;

j.  Whether Forever 21's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

k.  Whether Forever 21's acts breaching an implied contract they formed with Plaintiffs and the Class Members;

l.  Whether Forever 21 violated the Federal Trade Commission Act ("FTC Act");

m.  Whether Forever 21 was unjustly enriched to the detriment of Plaintiffs and the Class;

n.  Whether Forever 21 failed to provide notice of the Data Breach in a timely manner; and

o.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

179.  **Typicality**:  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

180.  **Adequacy**:  Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent. Plaintiffs have retained counsel who are competent and highly experienced in complex class action litigation—including consumer fraud and privacy class action cases—and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their experienced counsel.

181.  **Superiority**:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Forever 21's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them by Forever 21. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Forever 21 maintains regarding their consumers.

182.  Defendant has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

183.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

184.   As a condition of their employment with Defendant, Class Members were obligated to provide Defendant with PII, among other sensitive PII, their names, Social Security numbers, dates of birth, and bank account numbers. Defendant also retained sensitive PHI for each of the Class Members including but not limited to employee health plan information including enrollment and premiums paid.

185.   Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

186.   Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

187.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

188.   Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiffs and the Class in Defendant's possession was adequately secured and protected.

189.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove former employees' Private Information that Defendant was no longer required to retain pursuant to regulations.

190.   Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiffs and the Class.

191.   Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of employment with the company.

192.   Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

193.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

194.   Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting or redacting Private Information stored on Defendant's systems.

195.   Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions to not comply with industry standards for the safekeeping of the Private Information of Plaintiffs and the Class, including basic encryption techniques freely available to Defendant.

196.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

197.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

198.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when.

199.    Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

200.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and the Class.

201.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

202.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and the Class during the time the Private Information was within Defendant's possession or control.

203.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

204.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiffs and the Class

in the face of increased risk of theft.

205.   Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' Private Information.

206.   Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

207.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

208.   There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the present harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

209.   Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

210.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly

unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

211.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

212.   Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

213.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

214.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate

measures to protect the Private Information of Plaintiffs and the Class; and (viii) costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

215.   Indeed, Plaintiffs have already suffered identity theft and fraud as a direct result of the Data Breach.

216.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

217.   Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

218.   Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT II
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

219.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein. This claim is pleaded in the alternative to the implied contract claim pursuant to Fed. R. Civ. P. 8(d).

220.   Plaintiffs and Class Members conferred a monetary benefit upon Forever 21 in the form of monies paid for production services or other services.

221.    Forever 21 accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Forever 21 also benefitted from the receipt of Plaintiffs' and Class Members' Private Information.

222.    As a result of Forever 21's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

223.    Forever 21 should not be permitted to retain the money belonging to Plaintiffs and Class Members because Forever 21 failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Class Members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards.

224.    Forever 21 should be compelled to provide for the benefit of Plaintiffs and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

225.    Plaintiffs reallege and incorporate by reference all allegations of the preceding factual allegations as though fully set forth herein.

226.    Defendant required Plaintiffs and Class Members to provide, or authorize the transfer of, their PII as a condition of their employment. Defendant also retained sensitive PHI for each Class Memer including but not limited to employee health plan information including enrollment information and premium payment information.

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

227.   As a condition of their employment with Defendant, Plaintiffs and the Class provided their Private Information and Defendant retained their Private Information. In exchange, Forever 21 entered into implied contracts with Plaintiffs and Class Members in which Forever 21 agreed to comply with its statutory and common law duties to protect Plaintiffs' and Class Members' Private Information, to safeguard such information, to keep such information secure and confidential, and to timely notify Plaintiffs and the Class in the event of a data breach.

228.   Plaintiffs and Class Members would not have provided their Private Information to Forever 21 had they known that Forever 21 would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

229.   Plaintiffs and Class Members fully performed their obligations under their implied contracts with Forever 21.

230.   Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

231.   The losses and damages Plaintiffs and Class Members sustained (as described above) were the direct and proximate result of Forever 21's breach of its implied contracts with Plaintiffs and Class Members.

## COUNT IV
## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT
### Cal. Civ. Code § 1798.100 *et seq.* ("CCPA")
### (On behalf of the California Subclass)

232.   Plaintiff Scott realleges and incorporates all previous allegations as though fully set forth herein.

233.   As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has

decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access and disclosure. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."

234.   As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

235.   Forever 21 is subject to the CCPA and failed to implement such procedures which resulted in the Data Breach.

236.   It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

237.   Section 1798.150(a)(1) of the CCPA provides:

"Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business'

violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper."

238.   Plaintiff Scott and California Subclass Members are "consumers" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

239.   Forever 21 is a "business" as defined by Civ. Code § 1798.140(c) because Defendant:

a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

c. does business in California; and

d. has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 100,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

240. The PII taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiffs' and Class Members unencrypted first and last names and Social Security numbers among other information.

241. Plaintiff Scott's and California Subclass Members' Private Information was subject to unauthorized access and exfiltration, theft, or disclosure because their PII, including name and contact information was wrongfully taken, accessed, and viewed by an unauthorized third party.

242. The Data Breach occurred as a result of Forever 21's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

243. The Data Breach occurred as a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff Scott's and California Subclass Members' Private Information. Defendant failed to implement reasonable security procedures to prevent an attack on their server or network, including its email system, by hackers and to prevent unauthorized access of Plaintiff Scott's and California Subclass Members' Private Information as a result of this attack.

244. On September 13, 2023 Plaintiff Scott provided notice to Defendant pursuant to Cal. Civ. Code § 1798.150(b)(1), identifying the specific provisions of the CCPA Plaintiff Scott alleges Forever 21 has violated.

245. Defendant has failed to respond and has not cured or is unable to cure the violations described therein. Plaintiff Scott seeks all relief available under the CCPA including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) but

in no event less than one hundred dollars ($100) per California Subclass Member per incident. *See* Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

246.    As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, in addition to actual or statutory damages, Plaintiff Scott seeks injunctive relief, including public injunctive relief, declaratory relief, and any other relief as deemed appropriate by the Court.

## COUNT VI

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. and Prof. Code §§ 17200, *et seq.* ("UCL")
### (On behalf of the California Subclass)

247.    Plaintiffs Massengill   and Scott re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

248.    Plaintiffs Massengill   and Scott bring this claim on behalf of themselves and the California Subclass.

249.    The California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

250.    By reason of Defendant's above-described wrongful actions, inaction, and omission, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs Massengill   and Scott's and California Subclass Members' PII, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning of the UCL.

251.    In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data

security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), Cal. Civil Code § 1798.81.5, 45 C.F.R. § 164, *et seq.*, and the FTC Act. Plaintiffs and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, and want of ordinary care are ongoing and continue to this date.

252.    Defendant also violated the UCL by failing to timely notify Plaintiffs Massengill  and Scott and California Subclass members pursuant to Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their Private Information. If Plaintiffs and Class members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII and identities.

253.    Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, in that the private and confidential Private Information of consumers has been compromised for all to see, use, or otherwise exploit.

254.    Defendant's above-described wrongful actions, inaction, want of ordinary care, and practices also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect Private

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Information and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA and the FTC Act. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

255. Plaintiffs Massengill  and Scott and California Subclass Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, *inter alia*, the unauthorized release and disclosure of their Private Information.

256. Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs Massengill  and Scott's and California Subclass Members' Private Information also constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*., in that Defendant's conduct was substantially injurious to Plaintiffs and California Subclass Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

257. But for Defendant's misrepresentations and omissions, Plaintiffs Massengill  and Scott and California Subclass Members would not have provided their Private Information to Defendant, or would have insisted that their Private Information be more securely protected.

258. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs Massengill and Scott's and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

California Subclass Members' Private Information, they have been injured as follows: (1) the loss of the opportunity to control how their Private Information is used; (2) the diminution in the value and/or use of their Private Information entrusted to Defendants; (3) the increased, imminent risk of fraud and identity theft; (4) the compromise, publication, and/or theft of their Private Information; and (5) costs associated with monitoring their Private Information, amongst other things.

259.   Plaintiff Massengill and Scott take upon themselves enforcement of the laws violated by Defendant in connection with the reckless and negligent disclosure of Private Information. There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees and costs from the recovery in this action. Therefore, an award of attorneys' fees and costs is appropriate under California Code of Civil Procedure § 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

      a.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

      b.    For equitable relief enjoining Forever 21 from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information;

      c.    For equitable relief compelling Forever 21 to utilize

appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.    For an order requiring Forever 21 to pay for credit monitoring services for Plaintiffs and the Class of a duration to be determined at trial;

e.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f.    For an award of punitive damages, as allowable by law;

g.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h.    Pre and post-judgment interest on any amounts awarded; and

i.    Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 12, 2024           Respectfully Submitted,

By:   */s/ Gregory Haroutunian*
       Gregory  Haroutunian
       **CLAYEO C. ARNOLD, P.C.**

M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Brandon P. Jack (SBN 325584)
12100 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025
Telephone: (747) 777-7748
aberry@justice4you.com
gharoutunian@justice4you.com
bjack@justice4you.com

**SHUB & JOHNS LLC**
Jonathan Shub (No. 237708)
Benjamin F. Johns*
Samantha E. Holbrook*
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

**MILBERG COLEMAN BRYSON
PHILLPS GROSSMAN, PLLC**
John J. Nelson
280 S. Beverly Drive
Beverly Hills, CA 92102
Telephone: (858) 209-6941
jnelson@milberg.com.

*Interim Co-Lead Counsel for
 Plaintiffs and the Proposed Class*

*admitted *Pro Hac Vice*